**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| WILLIAM FUDGE, on behalf of himself and all others similarly situated, | ) ) |
| | ) MASTER FILE NO. 2:23-cv-00030 |
| *Plaintiff,* | ) Hon. Chief Judge Waverly D. Crenshaw, Jr. |
| | ) Hon. Alistair Newbern, Magistrate Judge |
| v. | ) |
| | ) This Document Relates to: |
| LOVE TRAVEL STOPS & COUNTRY | ) ALL ACTIONS |
| STORES, INC., d/b/a/ LOVE'S, | ) |
| | ) |
| *Defendant.* | ) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS CLASS ACTION COMPLAINT**

Robert A. Peal
SIMS FUNK, PLC
3322 West End Ave., #200
Nashville, TN 37203
rpeal@simsfunk.com

Peter Wahby
Allison Stewart
Hannah Putnam
Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, TX 75246
Peter.wahby@gtlaw.com
Stewarta@gtlaw.com
Hannah.putnam@gtlaw.com

*Attorneys for Love's Travel Stops*
*& Country Stores, Inc.*

Tristan L. Duncan
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Phone: (816) 474-6550
Email: tlduncan@shb.com

Daniel B. Rogers
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Phone: (305) 358-5171
Email: drogers@shb.com

Frederick S. Rudesheim (TN #035680)
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, D.C. 20006
Phone: (202) 783-8400
Email: frudesheim@shb.com

*Attorneys for Defendant, Murphy Oil USA, Inc.*

Michael T. Schmitt
ORTALE KELLEY LAW FIRM
330 Commerce Street, Suite 110
Nashville, TN 37201
mschmitt@ortalekelley.com

ASHLEY T. KISNER
Texas State Bar No. 00791783
akisner@clarkhill.com
N. TOBIAS SMITH
Texas State Bar No. 24033230
tsmith@clarkhill.com
CLARK HILL PLC
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Fax: (214) 651-4330

*Attorneys for Speedway LLC*

# TABLE OF CONTENTS

STANDARD OF REVIEW ................................................................................................ 2

BACKGROUND & REGULATORY OVERVIEW ...................................................................... 3

I.     Relevant Factual Allegations. ................................................................................. 3

    A.     Plaintiffs' Claims and Request for Relief. ............................................. 4

    B.     Plaintiffs' Putative 46 State Purchaser Classes. ..................................... 4

II.     The Petroleum Marketing Practices Act. ................................................................ 5

III.     The National Institute of Standards and Technology's Handbook 44. ................... 6

ARGUMENT ............................................................................................................................ 9

I.     The PMPA Expressly Preempts Plaintiffs' Claims. .............................................. 9

    A.     *Alvarez v. Chevron Corporation* ....................................................... 10

    B.     *Johnson v. MFA Petroleum Company* ............................................... 11

    C.     Plaintiffs' Claims Face a Similar Fate. ................................................ 14

        1.     The PMPA expressly preempts Plaintiffs' state common law claims. ..... 14

        2.     Plaintiffs' claims and requests for relief have the "same effect" as the dismissed claims and relief sought in *Johnson* and *Alvarez*. .................... 15

        3.     The exceptions under section 2822(g) do not apply. ............................... 17

II.     Plaintiffs' Claims Are Also Barred By Handbook 44. .......................................... 18

    A.     Plaintiffs' Claims are Precluded by Conflict Preemption. .................... 18

    B.     Plaintiffs' Claims Fail Because Handbook 44 Specifically Authorizes the Conduct Plaintiff Challenges and thus Creates a Safe Harbor. .......................................... 21

III.     Each of Plaintiffs' Four Counts Fail to State a Claim. .......................................... 23

    A.     Count I (Breach of Contract). ............................................................... 23

    B.     Counts II (Unjust Enrichment) and III (Money Had and Received). ................... 25

        1.     Quasi-contractual Claims Cannot Survive where a Contract Controls the Parties' Relationship. ......................... 25

2.     Plaintiffs Fail to Plead Facts to Support the Unjust-Retention Element of their Equitable Claims................................................................................. 26

3.     Voluntary Payment Bars Plaintiffs' Quasi-Contractual Claims. .............. 28

C.     Count IV (Declaratory Relief). ................................................................................. 29

CONCLUSION...................................................................................................................... 30

Plaintiffs' lawsuit attacks the design and operation of Defendants' retail gas dispensers and attempts to hold Defendants liable for conduct that fully complies with federal laws dictating how retail gas dispensers operate. Their claims are preempted, Defendants' practices are legal under both federal and state law, and in any event, none of the claims is sufficiently pleaded.

Defendants' dispensers, sometimes referred to as "blender pumps" or "single nozzle hoses," dispense multiple grades of gasoline through a single hose and nozzle. Plaintiffs allege that they purchased "premium" gasoline immediately following a purchase of "regular" or "mid-grade" gasoline by another customer.[1] Because a small amount of the less expensive lower grade/octane fuel remained in the hose when they began pumping their higher-grade/octane gasoline, Plaintiffs assert they paid more than they should have for the total amount of "premium" fuel received. Plaintiffs do not complain that the fuel they received was below the 91-octane level associated with the "premium" fuel. But not only are single nozzle hoses specifically permitted by both state and federal law, regulators charged with enacting laws to ensure equity between buyers and sellers in the retail fuel marketplace also *require* exactly what Plaintiffs challenge: *the fuel hose must remain wet while in operation*. Thus, any small residual of a different grade fuel from the preceding purchase results from decisions made by sophisticated regulators, who are authorized to determine what is most equitable for buyer and seller alike.

Accordingly, Plaintiffs' three cases should be dismissed in their entireties for three reasons. *First,* the federal Petroleum Marketing Practices Act expressly preempts Plaintiffs' claims. *Second,* implied preemption and a safe harbor exist because, in doing what Plaintiffs criticize,

---

[1] Federal laws set grades for gasoline based on the octane content of the fuel, with "premium" grade fuel having a higher grade/octane content than "mid-grade," which, in turn, has more octane than "regular" fuel.

Defendants were fully complying with state law requirements governing gas dispensers and pricing, established by state regulators who already determined that the method of pricing and selling gasoline through single nozzle dispensers is lawful, non-deceptive and equitable to buyer and seller alike – even after specifically considering and accounting for any residual fuel in the product line. *Third*, for various reasons set forth in section III below, Plaintiffs have failed to sufficiently plead each of their four Counts.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and this Court's August 23, 2023 Scheduling Order, Defendants Love's Travel Stops & Country Stores, Inc. ("Love's"), Murphy Oil USA, Inc. ("Murphy"), and Speedway LLC ("Speedway") ("Defendants") hereby file their Memorandum of Law in support of their Motion to Dismiss Plaintiff William Fudge, Jason Watson, and Mark Baird's (collectively referred to as the "Plaintiffs") Class Action Complaints. To survive a motion to dismiss, the right to relief asserted must be based on a "viable legal theory." *Left Fork Mining Co. v. Hooker*, 775 F.3d 768, 774 (6th Cir. 2014).

Federal Rule of Evidence 201(b)(2) allows judicial notice of a fact "not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Moreover, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). A matter that is properly the subject of judicial notice may be considered along with the pleadings when deciding a motion to dismiss for failure to state a claim. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) ("[I]f public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion . . ."). A court may take judicial notice of official records and reports without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *Id.*; *Toth v.*

2

*Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("Administrative regulations fall within the category of facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (considering public disclosure documents on a 12(b)(6) motion and noting that "[t]he practice of taking judicial notice of public documents is not new"); *see also* Fed. R. Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding.")

## BACKGROUND & REGULATORY OVERVIEW

### I.    Relevant Factual Allegations.

On May 19, 2023, Plaintiff William Fudge alleges he purchased motor fuel at a gas station operated by Love's, located in Baxter, Tennessee. (Fudge Compl. ¶ 20.) Fudge alleges he selected the fuel advertised as "premium" for $3.799 per gallon. (*See id.*) Fudge alleges he paid $18.06 for 4.754 gallons. (*Id.* ¶ 23.) On June 8, 2023, Plaintiff Jason Watson alleges he purchased motor fuel at a gas station operated by Murphy, located in Cookeville, Tennessee. (Watson Compl. ¶ 20.) Watson alleges he selected the fuel advertised as "premium" for $3.799 per gallon. (*See id.*) Watson alleges he paid $61.15 for 16.182 gallons. (*Id.* ¶ 23.) On June 1, 2023, Plaintiff Mark Baird alleges he purchased motor fuel at a gas station operated by Speedway, located in Murfreesboro, Tennessee. (Baird Compl. ¶ 20.) Baird alleges he selected the fuel advertised as "premium" for $3.999 per gallon. (*See id.*) Baird alleges he paid $58.13 for 14.536 gallons. (*Id.* ¶ 23.) Each Plaintiff alleges that, immediately prior to his transactions, another customer had purchased the fuel advertised as "regular" at the same pump. (Fudge Compl. ¶ 25; Watson Compl. ¶ 25; Baird Compl. ¶ 25.) Even though these transactions were in Tennessee, Plaintiffs purport to represent individuals from 45 other states.

The fuel pump that Plaintiffs used consisted of a hose and nozzle configuration that Plaintiffs term "single-nozzle," where one hose and nozzle dispense all three octane ratings of

3

gasoline Defendants' offer (as opposed to each octane rating having a dedicated hose and nozzle). (*See* Fudge Compl. ¶¶ 4, 21-22; Watson Compl. ¶¶ 4, 21-22; Baird Compl. ¶¶ 4, 21-22.) Plaintiffs allege that, due to the single-nozzle configuration of the pump, "a residual volume of regular motor fuel from the prior customer . . . became part of the first gallon of motor fuel pumped into Plaintiff's car." (Fudge Compl. ¶ 9; Watson Compl. ¶ 9; Baird Compl. ¶ 9.) Plaintiffs contend that the volume of the "residual amount of motor fuel" from the prior customer is "typically one third of a gallon." (*Id*.) Plaintiffs' Complaint does not allege that, prior to filing this litigation, they rejected or otherwise complained about the fuel they received. Nor do the Complaints allege that the fuel resulted in any performance issues for their vehicles.

The complaints were filed on May 26, 2023 (Fudge), June 16, 2023 (Watson), and June 12, 2023 (Baird). (*See generally id.*) Plaintiffs' core allegation is that Defendants failed "to deliver the full amount of premium motor fuel" to them. (Fudge Compl. ¶¶ 41 47, 51, 55; Watson Compl. ¶¶ 41, 47, 51, 55; Baird Compl. ¶¶ 41, 47, 51, 55.) According to Plaintiffs, Defendants overcharged them for the fuel. (*See* Fudge Compl. ¶¶ 26-27, 47, 51, 55; Watson Compl. ¶¶ 26-27, 47, 51, 55; Baird Compl. ¶¶ 26-27, 47, 51, 55.)

### A. Plaintiffs' Claims and Request for Relief.

The Plaintiffs' Complaint asserts claims for breach of contract, unjust enrichment, money had and received, and declaratory relief under the Declaratory Judgment Act. (*See* Fudge Compl. ¶¶ 38-55; Watson Compl. ¶¶ 38-55; Baird Compl. ¶¶ 38-55.) Additionally, in the Prayer for Relief, Plaintiffs also request "permanent injunctive relief." (*See* Fudge Compl. WHEREFORE; Watson Compl. WHEREFORE; Baird Compl. WHEREFORE.)

### B. Plaintiffs' Putative 46 State Purchaser Classes.

Plaintiffs propose that this Court certify class actions under the laws of Tennessee and forty-five other states. Plaintiffs do not allege any personal contacts with any state other than

Tennessee.

## II. The Petroleum Marketing Practices Act.

All labeling on a retail gasoline pump has been carefully scrutinized and approved by the federal government pursuant to the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2821-24, and the rules promulgated pursuant thereto.

The PMPA regulates the testing and disclosure of motor fuel octane. *See* 15 U.S.C. 2821-2824. Subchapter I addresses the petroleum franchise relationship. Subchapter II addresses the testing, certification, labeling and disclosure of a gasoline's octane rating. Subchapter III addresses the subsidization of motor fuel marketing. Subchapter II is the relevant section of the PMPA for purposes of these Plaintiffs' claims here. It has only been addressed in two prior cases, both of which dealt with how blender pumps operate (i.e., to stay wet, as required, they may retain a residual amount of a different grade of gasoline from the prior purchase), and both of which dismissed the plaintiffs' claims and putative class actions on a motion to dismiss.

The PMPA requires retailers to "display in a clear and conspicuous manner, at the point of sale to ultimate purchasers of automotive fuel, the automotive fuel rating of such automotive fuel . . . ." *Id*. § 2822(c). In the PMPA, Congress delegated to the Federal Trade Commission (FTC) the task of enacting a rule establishing "a uniform method of displaying the automotive fuel rating of automotive fuel at the point of sale to ultimate purchasers." *Id*. § 2823(c)(1)(B). The FTC, in turn, enacted the Fuel Ratings Rule (16 C.F.R. § 306, *et seq.*), which regulates how octane ratings are calculated and disclosed. 16 C.F.R. §§ 306.1-.2. The FTC provides exceptionally precise directions for how tanks must be labeled. *Id*. § 306.10(b)(1) (label must be in full view); § 306.12(a)(1) (label must measure 3 inches by 2.5 inches; text must be in Helvetica Black except octane rating, which must be in Franklin gothic; text must be centered and meet precise spacing specifications); § 306.12(c) (label must be yellow with black type and black border). Importantly,

5

***"[n]o marks or information other than that called for by [the Fuel Ratings Rule] may appear on the labels."*** *Id.* § 306.12(d) (emphasis added). Also importantly, the Fuel Ratings Rules applies to single-hose blender pumps like the dispensers at issue in this litigation. 16 C.F.R. § 206.10 (a).

Furthermore, the PMPA contains preemption provisions, preempting different or additional state requirements that are not "the same as" federal requirements. 15 U.S.C. §2824(a). In Subchapter II of the PMPA, Congress included this express preemption provision:

> To the extent that any provision of this subchapter [governing octane fuel ratings] applies to ***any act or omission***, no State or any political subdivision thereof may adopt or continue in effect, except as provided in subsection (b), ***any provision of law or regulation*** with respect to such act or omission, unless such provision of such law or regulation is ***the same as*** the applicable provision of this subchapter.

15 U.S.C. § 2824(a) (emphasis added). The Fuel Ratings Rule expressly incorporates this preemption provision into its text. 16 C.F.R. § 306.4(a).

As shown above, Subchapter II of the PMPA's comprehensive federal regulatory framework controls the method of disclosure of octane levels, completely federalizing how fuel retailers describe fuel, enacted based on the strong federal interest in uniformity of fuel grade disclosures to motorists in interstate commerce. *See* S. Rep. No. 95-731, at 878-79 (1978). Indeed, the Fuel Ratings Rule is intended "to ensure that producers and marketers provide consumers with the information they need to make ***smart liquid fuel-purchasing decisions***." Federal Trade Commission, *Complying with the FTC Fuel Rating Rule* (emphasis added).[2]

**III.     The National Institute of Standards and Technology's Handbook 44.**

The Department of Commerce, through the National Institute of Standards and Technology (NIST) and the National Conference on Weights and Measures (NCWM), has established a comprehensive federal regulatory system to encourage cooperation with the states to achieve

---

[2] *See* https://www.ftc.gov/business-guidance/resources/complying-ftc-fuel-rating-rule.

"uniformity in weights and measures" across the country. 15 U.S.C. § 272(c)(4); *see also id.* § 272(b)(10) (stating that the NIST is charged with cooperating with the states to establish standard practices); 15 C.F.R. § 200.100(b) ("NIST provides the central basis within the United States for a complete and consistent system of measurement."). The NIST's uniform standards have been "subsequently adopted, implemented, and regulated by the U.S. states and other local jurisdictions to ultimately achieve equity in the marketplace for consumers and businesses alike." *See* NIST, *OWM Responsibilities and Authorities*.[3] *See also* NCWM, *About NCWM* (stating the NCWM "develop[s] uniform and equitable weights and measures standards to: promote commerce and fair competition by leveling the playing field, ensure consumers 'get what they pay for,' foster confidence in marketplace transactions, and 'advance economic growth.'").[4] Pursuant to its authority, the NIST has promulgated Handbook 44 to provide "specifications, tolerances, and other technical requirements for weighing and measuring devices." NIST Handbook 44, at 1 (2023).[5] Handbook 44 has been adopted in all fifty states. NIST, *The NIST Handbooks and NCWM: A Brief History* ("Now titled NIST Handbook 44 Specifications, Tolerances, and Other Technical Requirements for Weighing and Measuring Devices, all 50 States adopt this handbook").[6] Tennessee incorporates Handbook 44 and compliance with its standards under the Kerosene and Motor Fuels Quality Inspection Act of 1989, TENN. CODE ANN. § 47-26-907.[7]

Handbook 44 directly addresses the single-nozzle design, regulating the fuel dispensing

---

[3] *See* https://www.nist.gov/pml/owm/owm-responsibilities-and-authorities.
[4] *See* https://www.ncwm.com/about-ncwm.
[5] *See* https://nvlpubs.nist.gov/nistpubs/hb/2023/NIST.HB.44-2023-upd1.pdf. For the Court's convenience, relevant excerpts of NIST Handbook 44 are attached as **Exhibit 1**.
[6] *See* https://www.nist.gov/pml/owm/nist-handbooks-and-ncwm-brief-history#:~:text=Now%20titled%20NIST%20Handbook%2044,50%20States%20adopt%20this%20handbook
[7] For the Court's convenience, a chart listing the state laws adopting Handbook 44 for all the states in which Plaintiffs have proposed classes is attached as **Exhibit 2**.

devices at issue here by requiring that "the selection of the unit price shall be made prior to delivery through a deliberate action of the customer to select the unit price for the fuel delivery." Handbook 44 Sec. 3.30, S.1.6.5.4(a). Further, Handbook 44 provides, "***A system shall not permit a change to the unit price during delivery of [the] product."*** *Id.* (emphasis added). Yet this is precisely what Plaintiffs want, a different price charged for the first fraction of a gallon.

Handbook 44 also mandates the use of a "wet-hose," which is "[a] discharge hose intended to be full of product at all times," prohibiting draining the fuel in the hose line. *Id.* at App. D; *see id.* at Sec. 3.30, S.3.1, 3.3., 3.7. This is because if the pump hose were not "wet" and could be drained, then "one customer might receive more fuel than he or she has paid for by draining the hose into his or her vehicle after the transaction. In turn, the subsequent customer might receive less fuel than he or she paid for, because at the beginning of the delivery, fuel flowing through the meter would be displacing air, not liquid fuel." NIST, *Antidrain Requirements for Liquid Retail Motor-Fuel Devices*, at 2-3.[8]

Moreover, the weights and measures regulators have already considered and addressed the alleged inequity of which Plaintiffs complain by specifically acknowledging that once the purchase of the higher-grade fuel exceeds 2.5 gallons, the full selected octane rating is received; accordingly, the regulators determined that on balance, the residual fuel involved in the first 2.5 gallons is too *de minimis* to warrant prohibiting. Report of the 74th National Conference of Weights and Measures 1989, NIST Special Publication 771, at 112 https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication771.pdf *("[A] customer who*

---

[8]  *See* https://www.nist.gov/system/files/documents/2017/05/09/WMConnections-Vol3-Issue2-April-2012.pdf. For the Court's convenience, the Antidrain Article is attached as **Exhibit 3**.

8

Case 2:23-cv-00030   Document 46   Filed 09/27/23   Page 12 of 38 PageID #: 181

*purchases at least 2-1/2 gallons will obtain the advertised octane."* (emphasis added)).[9] In other words, the regulators expressly approve the single nozzle dispensers as equitable to buyer and seller alike and certify the dispensers as accurate and non-deceptive. *Id.* (concluding that 99.5% of customers buy two gallons or more). This is particularly noteworthy here, because each of Plaintiff's three alleged purchases exceeded 2.5 gallons. (Fudge Compl. ¶ 23; Watson Compl. ¶ 23 ; Baird Compl. ¶ 23).

**ARGUMENT**

**I.      The PMPA Expressly Preempts Plaintiffs' Claims.**

Plaintiffs' cases are not the first of their kind. In the only federal appellate decision interpreting the preemptive effect of Subchapter II of the PMPA, the Ninth Circuit affirmed the dismissal of analogous claims. *Alvarez v. Chevron Corp.*, 656 F.3d 925, 934–35 (9th Cir. 2011). Later, and despite artful pleading aimed at avoiding *Alvarez*, a federal district court in Missouri likewise dismissed the *Johnson* case as preempted by Subchapter II of the PMPA and state law— something the Eighth Circuit had telegraphed in an earlier stage of the case. *Johnson v. MFA Petroleum Co.*, 10 F. Supp. 3d 982, 990–95 (W.D. Mo. 2014); *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 254 (8th Cir. 2012). These are the only courts that have substantively discussed the preemptive effect of Subchapter II of the PMPA.[10] Despite Plaintiffs' efforts to slightly alter their allegations, there is no meaningful difference between Plaintiffs' claims and the claims by plaintiffs in *Alvarez* and *Johnson*. Accordingly, these cases should be dismissed as well.

---

[9] For the Court's convenience, relevant excerpts of the Report of the 74th National Conference of Weights and Measures 1989 are attached as **Exhibit 4**.

[10] *VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 673 F. Supp. 2d 1073 (E.D. Cal. 2009) discusses preemption, but the court's analysis focused on a narrow exception under the PMPA concerning identification of fuel by trademarks or trade names. This case does not address trademarks or tradenames and instead is focused on the grades of fuel governed by the PMPA. And *M.O. Dion & Sons, Inc. v. VP Racing Fuels*, Inc., No. CV 19-5154-MWF (SSX), 2019 WL 4750116 (C.D. Cal. Sept. 27, 2019) simply restates and follows *Alvarez.*

9

### A. *Alvarez v. Chevron Corporation*

In *Alvarez*, the Ninth Circuit held section 2824 of the PMPA broadly preempted claims similar to those here. 656 F.3d at 934–35. There, six purchasers of motor fuel with an advertised octane rating of 91 or higher attacked "single-nozzle dispensers because these nozzles create the residual fuel problem…." and argued that this impact should be disclosed on the label. *Id.* at 928. Plaintiffs asserted common-law claims for breach of contract, breach of warranty, breach of the duties of good faith and fair dealing, as well as statutory claims under California's Unfair Competition Law and False Advertising Law. *Id.* at 930. The district court dismissed plaintiffs' common law claims as "precluded by the combination of California laws and regulations that render Defendants' conduct with respect to single-nozzle dispensers the only lawful means to deliver fuel" and because the plaintiffs failed to satisfy notice requirements under the UCC.[11] *Alvarez v. Chevron Corp.*, No. CV 09-3343-GHK (CWX), 2009 WL 5552497, at *2–4 (C.D. Cal. Sept. 30, 2009).[12] Additionally, the district court dismissed plaintiffs' claims under California's Consumer Legal Remedies Act and Unfair Competition Law because California law adopting Handbook 44 clearly permitted defendants' conduct. *Id.* Finally, the district court dismissed plaintiffs' claim under the California False Advertising Law because the PMPA expressly preempted it. *Id.* The Ninth Circuit affirmed.

The Ninth Circuit explained, "The PMPA contains a broad preemption against state and local laws and regulations addressing any acts or omissions covered by the PMPA…." 656 F.3d at 934. The Ninth Circuit expressly addressed the Fuel Ratings Rule, saying the "Rule

---

[11] As in *Alvarez*, so here too, as discussed in section III.A below, Plaintiffs' breach of contract claims fail to comply with the UCC and should be dismissed. As discussed in section III.B.2 below, Plaintiffs' other common law claims similarly should be dismissed because the single nozzle method of sale is an approved method of sale for dispensing fuel.

[12] The Ninth Circuit affirmed the dismissal of the common law claims based on UCC notice and therefore did not reach preemption for those non-statutory claims. *Alvarez*, 656 F.3d at 932.

comprehensively regulates all labeling, disclosure, and rating requirements to be displayed at the point of sale to retail gasoline customers." *Id.* (citing 16 C.F.R. § 306.10). Plaintiffs argued that their proposed corrective disclosure did not "conflict with federal law because the notification would not be displayed on the label itself and would not mention octane ratings." *Id.* at 935. But the Ninth Circuit disagreed, holding that a disclosure "designed to warn customers at the point of sale that the grade of fuel they purchase may or may not actually be delivered . . . would have the effect of challenging the accuracy and undermining the uniformity of federal octane labeling regulations promulgated by the FTC." *Id.* In other words, allowing plaintiff's claims would create a state law obligation that differed from what Congress and the FTC permitted and is preempted.

### B. *Johnson v. MFA Petroleum Company*

In *Johnson*, Judge Kays of the Western District of Missouri – in an outcome foreshadowed by the Eighth Circuit in an earlier appellate decision in *Johnson* – held the PMPA expressly preempted the plaintiff's sole claim under the Missouri Merchandising Practices Act ("MMPA"). 10 F.Supp.3d at 990–95; 701 F.3d at 243. Just like in *Alvarez*, *Johnson* involved a putative class action of motor fuel consumers attacking the single-nozzle dispensers due to residual gasoline remaining in the hose from the previous purchaser. 10 F.Supp.3d at 985–86. The district court initially held it had federal question jurisdiction over the case because the PMPA completely preempted the state law claims. *Johnson v. MFA Petroleum Co.*, No. 11-0981-CV-W-DGK, 2012 WL 511475, at *6 (W.D. Mo. Feb. 15, 2012). The court explained that Subchapter I of the PMPA, which addresses the petroleum franchise relationship, had been held to completely preempt state law claims and support removal jurisdiction. *Id.* at *3. Noting that the preemption provision in Subchapter II of the PMPA that applies to "any act or omission" is broader than the preemption provision in Subchapter I, the court concluded, "[W]hile no court has expressly considered the issue, common sense dictates that if § 2806 provides for complete preemption, the broader §

11

2824 would as well." *Id.* (quoting 15 U.S.C. § 2824).

On appeal, the Eighth Circuit reversed and remanded for the district court to consider whether there was federal jurisdiction under CAFA. *Johnson*, 701 F.3d at 253. Notably, the Eighth Circuit limited its holding to the narrow issue of whether § 2824 created federal jurisdiction over plaintiff's claim – not whether § 2824 expressly or impliedly preempted plaintiff's claim. *Id.* ("Because complete preemption is a question of federal jurisdiction over a claim, a conclusion that it does not exist at the outset does not mean that a plaintiff will ultimately prevail over a preemption defense on her underlying claim.").

Indeed, the Eighth Circuit foreshadowed the district court's finding that the PMPA expressly preempted plaintiff's claim under ordinary preemption. Citing *Alvarez*, the Eighth Circuit explained § 2824 was held to preempt "a complaint with somewhat similar allegations" by the Ninth Circuit. *Id.* at 249; *see id.* at 255 (Beam, J., dissenting) ("Johnson's claims are not meaningfully distinguishable from the ones asserted in *Alvarez.*").

On remand, in opposing the defendants' motion to dismiss the merits based on ordinary preemption, plaintiff attempted to distinguish *Alvarez* in three ways, all of which the court rejected. The court noted it was "not required to accept a plaintiff's artful pleading when it is clear from the totality of her allegations that her claim falls within a preempted area." *Johnson,* 10 F.Supp.3d at 991. Instead, the district court observed that the "preemption analysis often requires the court to look at the essence, or 'gravamen,' of a plaintiff's complaint…." *Id.*

*First*, plaintiff argued her claim had no connection to "octane disclosures" because she only referenced "grades" or "brands" of gasoline and never used the word "octane." *Id.* The court, however, rejected this argument because "there is no meaningful difference between a gasoline's 'grade/brand' and its octane rating." *Id.*

*Second*, plaintiff contended that "the plaintiffs in *Alvarez* explicitly requested an additional disclosure, whereas she has only requested the court enjoin the misrepresentations." *Id.* at 993. The court, however, explained that a disclosure "is clearly implied in the Complaint" because "[t]he only feasible ways to suspend these 'misrepresentations' would be to order Defendants to either place corrective signage on the pump akin to the *Alvarez* disclosure or to remove the grade/octane disclosures altogether." *Id.*

*Third*, like the Plaintiffs here, plaintiff pointed out that she requested monetary relief. *Id.* at 995. The court held that her claim would be preempted even if she only requested monetary relief explaining "there would have to be a finding that Defendants either failed to disclose the residual fuel problem or that the labeling on the pump misrepresented the grade/octane of the selected higher grade gasoline." *Id.* Further, "judgment stemming from such a finding would have the ***practical effect*** of imposing a state law requirement to warn consumers that the fuel pumps are incapable of dispensing the exact fuel amount at the designated higher grade/octane level." *Id.* (emphasis added). Accordingly, the court held the "gravamen" of plaintiff's complaint would impose requirements on defendants with respect to octane disclosures that are not the same as those under the PMPA. *Id.* at 994–995.

The district court also identified two alternative grounds for dismissing plaintiff's claim. *First*, the court held that the PMPA impliedly preempted plaintiff's claim because it "would either force Defendants to make additional disclosures regarding the pump's inability to dispense the full amount of the selected grade or to remove the octane disclosures altogether." *Id.* at 996. This, the court observed, "interferes with Congress' objective of presenting information regarding octane disclosures in an easily-understood format." *Id. Second*, the court held that Missouri state law expressly precluded plaintiff's claims and allows and regulates single-hose pumps. *Id.* at 997

13

(citing Mo. Rev. Stat. § 414.022 ("The State of Missouri hereby preempts the field of regulating the inspection of and providing specifications for any substance regulation by sections 414.012 to 414.152 ...."); id. § 414.112(1); Mo. Rev. Stat. § 414.012 *et seq*. (establishing an extensive regulatory scheme for gasoline dispensing devices); Mo. Code Regs. Ann. Tit. 2, § 90-30.080(4) (adopting Handbook 44 requirements as the governing standard for measuring devices used in the sale of petroleum in Missouri).)

### C. Plaintiffs' Claims Face a Similar Fate.

#### 1. The PMPA expressly preempts Plaintiffs' state common law claims.

Plaintiffs attempt to avoid *Alvarez* and *Johnson* by abandoning statutory consumer protection claims in favor of three state common law claims (the breach of contract and equitable claims), but the PMPA similarly preempts these state common law causes of action as well.[13] *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) (holding a provision preempting state "requirements" preempts common law duties) (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522 (1992)). "Preemption depends on the conduct to which such [state] law is applied, not on the form or label of the law." *Blakeman v. Mead Containers*, 779 F.2d 1146, 1151 (6th Cir. 1985) (cleaned up, alteration original) (holding provision preempting "any and all State laws" preempted state contract law claims); *see Smith v. Commonwealth Gen. Corp.*, 589 F. App'x 738, 744 (6th Cir. Oct. 9, 2014) ("Even claims characterized as state-law contract claims can be preempted.").

Section 2824 broadly prohibits states and political subdivisions from adopting or continuing in effect "*any* provision of law or regulation" with respect to octane disclosures. Section 2824 does not condition its preemptive effect on the source of the state law. Courts interpreting the franchisor/franchisee section of the PMPA in Subchapter I consistently find it preempts state

---

[13] Moreover, these common law claims should be dismissed under the alternative grounds discussed in section III, similar to the contract claims in *Alvarez*.

contract and equitable claims. *Clark v. BP Oil Co.*, 137 F.3d 386, 396 (6th Cir. 1998) (holding section 2806(a) preempted claims premised on implied contractual duties); *see also Consumers Petroleum Co. v. Texaco, Inc.,* 804 F.2d 907, 915 (6th Cir. 1986) (holding that state law claims for misrepresentation and fraud were preempted by section 2806(a)); *Kehm Oil Co. v. Texaco,* 537 F.3d 290, 299 (3d Cir. 2008) (holding plaintiff's breach of contract and other state law claims could be preempted by section 2806(a) if the district court found they were intimately intertwined with termination or nonrenewal of a franchise); *Chevron USA, Inc., v. Mebtahi*, 148 F.Supp.2d 1019, 1028 (C.D. Cal. 2000) (holding that section 2806(a) expressly preempts state breach of contract claims). Because the preemption provision in Subchapter II, which is applicable here, is even broader than Subchapter I's preemption provision (*see Johnson,* 2012 WL 511475, at *3), there is an even stronger case for preemption of Plaintiffs' common law claims.

> **2. Plaintiffs' claims and requests for relief have the "same effect" as the dismissed claims and relief sought in *Johnson* and *Alvarez*.**

Plaintiffs may also try to escape *Alvarez* and *Johnson* by arguing that they are not requesting corrective disclosures but instead requesting only monetary relief. But as this Court correctly reasoned at the status conference, the predicate to any monetary relief is a determination that the sale itself is unlawful. This aligns with the reasoning in *Alvarez* and *Johnson* that the claims, if successful, would effectively establish a state law requirement, obligation, or duty to sell or price the fuel dispensed through blender pumps in a different way, which would contradict the federal regulations.

Plaintiffs' characterizations do not change the practical effect of their claims. The gravamen is that Defendants inaccurately represent the fuel sold to a consumer who selects a higher-grade octane than the grade selected by the prior purchaser at that pump. Plaintiffs assert that they did not receive the grade they selected because "the first gallon of fuel that was pumped

15

into their cars regularly contained a significant amount of regular or mid-grade motor fuel," due to the regulator-approved design of the single-nozzle fuel dispensing system. Fudge Compl. at ¶¶ 8-9; Watson Compl. at ¶¶ 8-9, Baird Compl at ¶¶ 8-9. But nothing on the pumps indicated that Defendants represented that they would provide fuel which, on a drop-by-drop basis, could be independently sold as "premium fuel." Plaintiffs received *exactly* what Defendants represented they would receive, which is fuel in compliance with state and federal standards for the fuel grade Plaintiffs selected. Plaintiffs' "understanding" that every drop of fuel dispensed must be "premium" is contrary to the PMPA. No fuel pump label makes such a representation nor could it under the labeling requirements of the PMPA. Moreover, as previously explained, once Plaintiffs pump 2.5 gallons, they *have* achieved the precise octane level displayed.

As in *Johnson* and *Alvarez*, a judgment here would have the practical effect of requiring Defendants to provide a warning or disclosure regarding the potential for residual fuel of a lower-grade in the first 2.5 gallons. In other words, the only way Defendants could avoid liability under Plaintiffs' theory of the case would be for Defendants to post a disclosure different from what federal law mandates. Just like in *Johnson*, "there would have to be a finding that Defendants either failed to disclose the residual fuel problem or that the labeling on the pump misrepresented the grade/octane of the selected higher grade gasoline." 10 F. Supp .3d at 995. But such a warning would be an attack on the federal regulatory design governing octane disclosures.

Similar to the plaintiff in *Johnson*, Plaintiffs cannot avoid express preemption "through artful pleading that removes the covered words from the complaint but leaves in the covered concepts." *Segal v. Fifth Third Bank, N.A.,* 581 F.3d 305, 311 (6th Cir. 2009). Instead, courts should look to the "gravamen" of a plaintiff's complaint when determining whether plaintiff's claims are preempted. *Kurns v. R.R. Friction Prods. Corp.,* 565 U.S. 625, 635 (2012); *see also*

*White v. Medtronic, Inc.*, 808 Fed. Appx. 290, 296 (6th Cir. 2020) (considering the "gravamen" of plaintiff's claims when finding plaintiff's claims were expressly preempted by the Medical Device Amendments to the Food, Drug, and Cosmetics Act). The gravamen of Plaintiffs' complaints is clear: Plaintiffs assert that Defendants' fuel pump dispensers inaccurately represented the amount of premium fuel Plaintiffs would receive. Therefore, 15 U.S.C. § 2824(a) expressly preempts Plaintiffs' claims, and Plaintiffs' claims must be dismissed.

### 3. The exceptions under section 2822(g) do not apply.

The PMPA provides a narrow exception to preemption for claims based on (1) display and representation of fuel characteristics "***other than its automotive fuel rating***" or (2) the misleading use identification of fuel by trademarks or trade names. 15 U.S.C. § 2822(g) (emphasis added). Plaintiffs' allegations that they purchased premium fuel and received less than 100% premium fuel directly relate to automotive fuel ratings. *See Johnson*, 10 F.Supp.3d at 991 ("[T]here is no meaningful difference between a gasoline's 'grade/brand' and its octane rating."). Plaintiffs' designation of "regular", "mid-grade" and "premium" fuel all relate to the automotive fuel rating of the gasoline they purchased. Notably, while Plaintiffs focus on these adjectives, Plaintiffs do not complain that they did not receive what they bargained for, which was 91 octane fuel. Nonetheless, the Complaints regarding "premium" fuel is nothing more than Complaints about the octane rating, which is, by definition, the "automotive fuel rating." 15 U.S.C. § 2822(g). Accordingly, the 2822(g) exception does not apply.

Indeed, the district courts in *Alvarez* and *Johnson* both held the exceptions in § 2822(g) did not apply to plaintiffs' analogous claims regarding residual fuel. *Alvarez*, 2009 WL 5552497, at *5 ("Finally, as a last resort, Plaintiffs argue that the PMPA exceptions for the display and representation of fuel characteristics *other than octane ratings* and identification of fuel by trademarks or trade names shield this claim from dismissal [due to preemption under the PMPA].

However, neither of these exceptions applies to the disclosure requirements Plaintiffs ask us to impose."); *Johnson*, 2012 WL 511475, at *6 ("Plaintiff offers no support for her argument that the representations at issue in this case are the 'identification of automotive fuel at the point of sale (or elsewhere) by the trademark, trade name, or other identifying symbol or mark' and the Court can find no other evidence that the alleged brand/grade misrepresentations refer to anything other than octane or automotive fuel ratings.").

## II. Plaintiffs' Claims Are Also Barred By Handbook 44.

### A. Plaintiffs' Claims are Precluded by Conflict Preemption.

For similar reasons, Plaintiffs' claims are likewise barred by the related doctrine of conflict preemption. State law is preempted as conflicting with federal law when: (1) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" – i.e., when it interferes with the *goals* of Congress; or (2) compliance with federal and state requirements is impossible. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 154 (1982) (holding that the standard for finding frustration of congressional purpose does not require a showing of impossibility). Here, Plaintiffs' claims frustrate the uniformity of the federal weights and measures standard and make it impossible for Defendants to comply with both that standard and Plaintiffs' demands.

The inescapable conclusion is that Plaintiffs' claims represent a collateral attack on the PMPA's octane disclosure requirements and the federal/state "Weights and Measures" system that Congress has created through the NIST and Handbook 44. Courts are not the proper forum to resolve Plaintiffs' disagreement with federal regulatory decisions. As the Fourth Circuit explained in the context of a similar cooperative federal/state regulatory system created by the Clean Air Act, the result of allowing Plaintiffs' claims to proceed "would be a balkanization of clean air regulations and a confused patchwork of standards, to the detriment of industry and the

18

environment alike." *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 296 (4th Cir. 2010). The Fourth Circuit held that state-common-law nuisance claims were preempted by the Clean Air Act, despite a statutory savings clause. *Id.* at 303–04. Like the weights and measures regime here, the statutory scheme in *TVA* was a cooperative federal/state system. Nevertheless, the Court held that "[l]itigation that amounts to nothing more than a collateral attack on the system, however, risks results that lack both clarity and legitimacy." *Id.* at 301.

The Third Circuit has also explained how conflict preemption is particularly appropriate when the federal regulatory system formulates policy by carefully balancing competing values. *See Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010).[14] That is exactly what occurs in setting weights and measures standards, where regulators necessarily balance the need for accuracy against technical feasibility and costs. As the *Farina* Court held, allowing state common law and consumer fraud claims to proceed "permits a re-balancing of those considerations."[15] *Id*. The resulting verdicts and damage awards would pose a tremendous obstacle to the federal goal of uniform Weights and Measures standards. Plaintiffs' claims—whether premised on money damages, injunctive relief, or mandatory disclosure—all interfere with this system because they effectively coerce Defendants to use a different weights and measures standard than that permitted by NIST and the NCWM. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 325 (2008) ("State tort law

---

[14] "The reason why state law conflicts with federal law in these balancing situations is plain. When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives. Allowing state law to impose a different standard permits a re-balancing of those considerations. A state-law standard that is more protective of one objective may result in a standard that is less protective of others."

[15] Plaintiffs' theory of recovery would also have the anomalous effect of requiring that every customer who purchased regular grade fuel, immediately after someone who purchased premium or mid-grade fuel from the same single-nozzle dispenser, to pay Defendants additional money for the higher-grade fuel allegedly left in the dispenser.

… disrupts the federal scheme no less than state regulatory law to the same effect."); *see generally Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 521 (1992); *see Alvarez*, 656 F.3d at 935 (finding express preemption when the proposed state disclosure requirements "would have the effect of challenging the accuracy and undermining the uniformity of federal octane labeling regulations promulgated by the FTC.").

*Alvarez* and *Johnson* correctly recognized Congress's goal of creating "a uniform and simplistic system of octane disclosures to ensure that consumers have the necessary information to ensure efficient and effective petroleum purchases." *Johnson,* 10 F. Supp. 3d at 996; *Alvarez*, 656 F.3d at 935; *see also Hillman v. Maretta*, 569 U.S. 483, 491 (2013) (considering Congressional purposes and objectives in determining the existence of obstacle preemption). As in *Alvarez* and *Johnson*, Plaintiffs' lawsuit would have the effect of creating ad hoc, state-by-state requirements in direct contravention of the purpose of the PMPA and standards promulgated by the NIST. Accordingly, Plaintiffs' claims frustrate the goal of the federal standards to establish the uniform measurement and sale of retail fuel.

Further, as discussed previously, Plaintiffs' claims would force Defendants to make additional disclosures in *violation of* the PMPA. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (holding a state-law claim was preempted by the Federal Drug and Cosmetic Act when "it was impossible for [the defendant] to comply with both its state-law duty to strengthen the warnings on [a prescription drug's] label and its federal-law duty not to alter [the drug's] label."). As discussed further below, the claims would also force Defendants to violate the provisions of Handbook 44 that dictate that a fuel must always remain in the hose and that the price of fuel may not be changed during delivery. *See Johnson*, 10 F. Supp. 3d at 994 n.5 (citing Handbook 44 Sec. 3.30, S1.6.5.4 ("the selection of the unit price shall be made prior to delivery using controls on the

device or other customer-activated controls. A system shall not permit a change to the unit price during delivery of [the] product.")); Handbook 44 Sec. 3.30, S3.1, 3.3, 3.7 (requiring that a residual amount of fuel must remain in the gasoline hose at all times).

For these reasons, Plaintiffs' claims conflict with federal law and are impliedly preempted.

**B.     Plaintiffs' Claims Fail Because Handbook 44 Specifically Authorizes the Conduct Plaintiff Challenges and thus Creates a Safe Harbor.**

Even if the Court were to conclude that Handbook 44 does not impliedly preempt Plaintiffs' claims, Handbook 44 authorizes the conduct Plaintiffs challenge, specifically addressing the single-nozzle design. Handbook 44 requires that "the selection of the unit price shall be made prior to delivery using controls on the device or other customer-activate controls. ***A system shall not permit a change to the unit price during delivery of [the] product***." Handbook 44 Sec. 3.30, S.1.6.5.4 (emphasis added). Yet this is precisely what Plaintiffs want, a different price charged for the first fraction of a gallon of gasoline. Handbook 44 also mandates the use of a "wet-hose," which is "[a] discharge hose intended to be full of product at all times," and it prohibits any means that would drain the fuel in the hose line. *Id.* at S.3.1, 3.3., 3.7.

The courts in *Alvarez* and *Johnson* both found Handbook 44's authorization of defendants' conduct provided a safe harbor from liability. In *Alvarez*, the district court explained that "the governing regulatory scheme expressly … prohibits draining or diversion mechanisms, and forbids a change in unit price mid-delivery," and, thus, defendants were afforded a *safe harbor* from liability. *Alvarez*, 2009 WL 5552497, at *6 (emphasis added). The Ninth Circuit affirmed and held, "California law unequivocally permits Defendants' conduct, therefore affording *safe harbor* from UCL liability." Similarly, in *Johnson*, the district court held, "Missouri law provides a *safe harbor* from liability because it expressly allows—and extensively regulates—this type of gasoline pump as a permissible measuring device for gasoline dispensing." 10 F. Supp. 3d at 997 (citing

21

Handbook 44 Sec. 3.30, S1.6.5.4, 3.1, 3.3, 3.7). Just as in *Alvarez* and *Johnson*, the same provisions of Handbook 44, which are adopted by applicable state law,[16] specifically authorize Defendants' conduct. There can be no injustice or unfairness when Defendants are doing what state law not only permits, but requires. Imposing common law liability for adhering to state and federal laws that expressly mandate the practices being challenged would in and of itself be inequitable, and such a lawsuit should not be permitted to continue.

Consider how Tennessee's Department of Agriculture regulates retail gasoline dispensing. *See generally* TENN. CODE ANN. § 47-18-1301, *et. seq.* (2023). It is Tennessee's public policy to promote and protect the public health, safety, and welfare by ensuring that motor fuels are "adequately labeled and posted" and "[m]eet or exceed certain minimum standards of quality." *Id.* § 47-18-1302. The Tennessee regulatory scheme provides that the Department "shall, at least once each year, inspect and collect at least one (1) sample for testing from each location from which a person conveys . . . motor fuel for consumption in Tennessee." *Id*. § 47-18-1305. If a person offers motor fuel in violation of the statute's standards, then that person is subject to a fine, the issuance of stop-sale order, or both, in the discretion of the commissioner. *Id*. § 47-18-1307.

Plaintiffs attempt to challenge a fuel pump design that has been inspected and approved by the Tennessee Department of Agriculture, as well as its determination that each such pump accurately measured the monetary cost of the fuel dispensed. This is precisely the tactic used in *Alvarez* when California plaintiffs attacked the single-nozzle design. *Alvarez*, 656 F.3d at 933–34. In dismissing those claims, the *Alvarez* court analyzed California fuel-related regulations that are analogous to Tennessee regulations discussed above governing the inspection and certification of retail gasoline dispensers. *Id*. at 929 (discussing Cal. Bus. & Prof. Code §§ 121000, 13590,

---

[16] For example, TENN. CODE ANN. § 47-26-907. *See* **Exhibit 2**.

12500(a)-(b)). The same outcome is appropriate here, for the exact same reason. It makes no sense for a court to impose civil liability on a defendant for adhering to the mandates of regulators.

### III. Each of Plaintiffs' Four Counts Fail to State a Claim.

#### A. Count I (Breach of Contract).

Plaintiffs' first claim is a breach of contract, both implied and express. There are two unsurmountable obstacles for Plaintiffs: They have failed to sufficiently allege a breach, and, even if they had, they have failed to comply with the notice requirement for bringing such a claim.

To begin, Plaintiffs have failed to adequately allege a breach. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006); *see also Wright v. Wacker-Chemie AG*, No. 1:13-cv-331, 2014 WL 3810584, at *13–14 (E.D. Tenn. Aug. 1, 2014) (granting motion to dismiss express and implied contract claims; noting that an implied contract claim requires inequitable retention of a benefit conferred by plaintiff).

*First*, as noted above, each Plaintiff alleges he purchased more than 2.5 gallons of fuel. (Fudge Compl. ¶ 23; Watson ¶ 23; Baird Compl. ¶ 23. As also explained previously, the weights and measures regulators acknowledge that once the purchase of the higher grade fuel exceeds 2.5 gallons, the full selected octane rating is received. *See* Report of the 74th National Conference of Weights and Measures 1989, NIST Special Publication 771, at 112 ("[A] customer who purchases at least 2-1/2 gallons will obtain the advertised octane) (**Exhibit 4**). This Court may take judicial notice of this because each Plaintiff alleges he purchased more than 2.5 gallons of fuel, so as a matter of law, he received what he paid for. Even under Plaintiffs' artful contract theories, there has been no breach.

*Second*, the alleged breach is the labeling and selling of fuel in the precise manner that federal and state regulators require Defendants to label and sell their fuel. It is axiomatic that courts lack authority to enforce a contract to engage in illegal conduct. *Ledbetter v. Townsend*, 15 S.W.3d

462, 464 (Tenn. Ct. App. 1999) (collecting cases). The same reasoning supports a finding that no breach can occur for complying with mandatory laws.

Moreover, even if Plaintiffs could overcome the no-breach obstacle, they still cannot escape their own failure to comply with Tennessee contract law. The UCC controls any contract that Plaintiffs' fuel purchase created. *See* TENN. CODE ANN. § 47-2-204. "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities . . . and things in action." *Id.* § 47-2-105(1). And a contract for the sale of fuel is a contract for the sale of goods. *Id.* § 47-2-107.[17] The UCC requires that a buyer who accepts goods under a contract notify the seller of a breach "within a reasonable time after he discovers or should have discovered any breach . . . ***or be barred from any remedy***." *Id.* § 47-2-607 (emphasis added). The Plaintiffs accepted the fuel from Defendants when they drove away using the fuel and failed to reject it based on its purported nonconformity. *See id.* § 47-2-606 (stating acceptance of goods occurs when the buyer "does any act inconsistent with the seller's ownership" or "fails to make an effective rejection" after a reasonable opportunity to do so).

Plaintiffs have not plead compliance with the UCC notice provision. Nor is the filing of this litigation sufficient to satisfy the notice requirement. *See Bunn v. Navistar*, 797 Fed. Appx.

---

[17] *See also Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1310 n.1 (S.D. Fla. 1999) ("Contracts for the sale of fuel products, including gasoline supply contracts, have been held to constitute transactions for the sale of 'goods' within the meaning of Article 2 of the Uniform Commercial Code."); *Steiner v. Mobil Oil Corp.*, 569 P.2d 751, 756 n.3 (Cal. 1977) (defining "goods" and stating gasoline "plainly falls within that definition"); *Oskey Gasoline & Oil Co. Inc. v. OKC Refining Inc.*, 364 F. Supp. 1137, 1141 n.2 (D. Minn. 1973) (defining goods as "all things. . .which are movable at the time of identification to the contract for sale" and stating "[c]ertainly the motor fuel gasoline and fuel oil covered by the contract in issue fall properly under this definition"); *Mansfield Propane Gas v. Folger Gas Co.*, 204 S.E.2d 625 (Ga. 1974) (propane sale was a sale of goods under the UCC).

247, 253 (6th Cir. Jan. 7, 2020) (rejecting plaintiff's contention that "the complaint itself constituted sufficient notice" under the UCC). Plaintiffs are therefore "barred from any remedy," and the Court should dismiss the Plaintiffs' breach of contract claim. *See* TENN. CODE ANN. § 47-2-607. Because Plaintiffs' failure to provide notice cannot be cured by amending the Complaints, such dismissal should be with prejudice.[18]

**B.      Counts II (Unjust Enrichment) and III (Money Had and Received).**

Under Tennessee law, these two claims "are essentially the same cause of action" and are considered "quasicontractual actions." *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006) (analyzing unjust enrichment and money had and received as one cause of action). To survive a motion to dismiss on these claims, Plaintiffs must allege facts supporting each element of the causes of action: (1) a benefit was conferred upon the defendant by the plaintiff; (2) the defendant had an "appreciation" of the benefit conferred upon it; and (3) defendant accepted the benefit under such circumstances that it would be inequitable for it to retain the benefit without payment of the value to plaintiff. *Id*.

**1.      Quasi-contractual Claims Cannot Survive where a Contract Controls the Parties' Relationship.**

In Count I, Plaintiffs allege the existence of a contract, and Defendants do not dispute the existence of a contract. The law is clear: Quasi-contractual theories of liability exist to "impose a

---

[18] The Complaints' allegation that Defendants have "known for years that [they] w[ere] . . . selling regular or mid-grade motor fuel for the price of premium motor fuel" (Fudge Compl. ¶ 11; Watson Compl. ¶ 11; Baird Compl. ¶ 11) is baseless and does not discharge the UCC notice requirement. The notice requirement exists to inform the seller that the buyer believes a breach has occurred. *See K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106, 1113 (6th Cir. 1982). A seller's knowledge of ***facts*** is immaterial to its knowledge of the buyer's ***claim of breach***. *See Standard All. Indus. v. Black Clawson Co.*, 587 F.2d 813, 825 (6th Cir. 1978) (quoting *Am. Mfg. Co. v. U.S. Shipping Board E. F. Corp.*, 7 F.2d 565, 566 (2d Cir. 1925)) (applying identical UCC provision and stating "[t]he notice 'of the breach' required is not of the facts . . . but of buyer's claim that they constitute a breach").

contractual obligation where one does not exist." *B L Corp. v. Thomas & Thorngren*, 162 S.W.3d 189 (Tenn. Ct. App. 2004). Tennessee courts have observed, "[i]t is a general rule of law that an implied contract or quasi-contract will not be imposed in circumstances where an express contract or agreement exists." *W. Silver Recycling, Inc. v. ProTrade Steel Co., LTD.*, 476 F. Supp. 3d 667, 681 (M.D. Tenn. 2020) (collecting Tennessee cases). This rule equally applies when an enforceable oral contract governs a transaction. *See Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*, 652 S.W.3d 802 (Tenn. Ct. App. 2021) (finding unjust enrichment and money had and received unavailable when an "enforceable oral contract was formed").

Because the UCC created an enforceable contract among the parties, the only dispute left concerns the scope of the contracts' terms and whether Defendants breached those agreements. A dispute about contract terms, however, is not a dispute that a contract exists. *See W. Silver Recycling, Inc.*, 476 F. Supp. 3d at 681 (granting summary judgment on unjust enrichment claim because "the parties do not dispute that a contract existed; instead they dispute the terms of that contract"). Plaintiffs cannot recover on quasi-contractual claims when an enforceable contract exists, so the Court should dismiss Counts Two and Three of the Complaints.

### 2.     Plaintiffs Fail to Plead Facts to Support the Unjust-Retention Element of their Equitable Claims.

Plaintiffs fail to plead facts supporting their assertions that the Defendants' conduct was "unjust and in bad faith." In fact, as explained in section II.B, Handbook 44 specifically authorizes the use of single-nozzle pumps, requires use of a wet-hose, and prohibits changing the unit price during delivery of the gasoline. Just as the district court in *Alvarez* explained, "A practice cannot be 'unlawful' or 'unfair' … if it is authorized by specific legislation," Defendants' conduct was not "unjust and in bad faith" because it was specifically authorized by law. *Alvarez*, 2009 WL 5552497, at *6. Further, as previously discussed, the residual fuel in the hose between purchases

has already been deemed immaterial and not unjust. *See, e.g.*, *Johnson*, 10 F. Supp. 3d at 993 n.5 (rejecting claim that price should be adjusted for the residual portion of gasoline from prior purchase or that the residual amount should be expelled before the next customer because both operations are prohibited by the State's adoption of the provisions in Handbook 44).

Nor have Plaintiffs pled facts supporting that, even under their artful equitable claims, Defendants were enriched. To the extent Plaintiffs conferred a theoretical, *de minimis* benefit, Plaintiffs have failed to plead facts establishing Defendants retained any benefit whatsoever. For example, using the named Plaintiffs' purchases as an example, the very next sale after their higher-grade sales may have been to someone who only paid Defendant for regular grade fuel yet received a splash of the residual higher-grade fuel lingering in the wet hose from Plaintiffs' transactions.

Plaintiffs' theory of recovery is also foreclosed by the simple fact that it would be commercially impracticable for every gas station operator to replace single-nozzle fuel dispensing systems throughout Tennessee and/or across the United States. *See generally eBay Inc. v, MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006) (stating that according to "well-established principles of equity" a court must consider "the balance of hardships between the plaintiff and defendant" when considering whether a remedy in equity is warranted); *N. Am. Cap. Corp. v. McCants*, 510 S.W.2d 901, 905 (Tenn. 1974) (excusing contract performance that is unreasonably difficult or expensive).[19] Indeed, in *Johnson,* the district court observed that requiring the

---

[19] In fact, before 2016, Tennessee *required* fuel retailers to use equipment certified by the California Air and Resources Board ("CARB") to comply with Stage II vapor recovery requirements – requirements created by EPA to minimize gasoline vapor escape at retail fuel pumps. *See* Tenn. Comp. R. & Regs. 1200-03-18-.24 ("The Stage II vapor recovery system must be approved by the Technical Secretary; certified by the [CARB]; designed, installed, operated, and maintained to recover gasoline vapors displaced during dispensing to motor vehicle fuel tanks; and accessible for inspection and testing."). CARB required (and still requires) the use of single-hose fuel pumps to comply with Stage II vapor recovery requirements. *See* CARB, Vapor

defendants to replace all its gas pumps would fail the "balancing of hardships test." 10 F. Supp. 3d at 994 n.5 (citing *Newmark v. Vogelgesang*, 915 S.W.2d 337, 339 (Mo. Ct. App. 1996) ("[E]quity will not usually interfere in trivial matters, or where the injunction will work little benefit to plaintiff and cause great hardship to defendant.")).

### 3. Voluntary Payment Bars Plaintiffs' Quasi-Contractual Claims.

Plaintiffs concede they voluntarily paid Defendants, and this also bars their quasi-contractual claims. In Tennessee, the voluntary payment doctrine means that "[e]quity will not aid a volunteer." *Cole v. Caruso*, No. W2017-00487-COA-R3-CV, 2018 WL 1391625, at *6 (Tenn. Ct. App. Mar. 20, 2018). In the absence of fraud or duress, a plaintiff who makes voluntary payments to another cannot subsequently sue to recover those payments, even if they were made without consideration. *See id.*

Plaintiffs' Complaints do not allege Defendants defrauded them or caused them to involuntarily pay for fuel. But Plaintiffs' Complaints *do* assert they "inserted [their] credit card[s] into [Defendants'] single-nozzle fuel dispensing system" (Fudge Compl. ¶ 21; Watson Compl. ¶ 21; Baird Compl. ¶ 21) to make a voluntary payment for fuel, which is sufficient to dismiss the quasi-contractual causes of action according to the voluntary payment doctrine. *See also Salling v. Budget Rent-A-Car Sys.*, 672 F.3d 442, 444–45 (6th Cir. 2012) (affirming dismissal of quasi-contractual claim where a consumer voluntarily paid a fee to defendant and made no claim of duress or compulsion, and his fraud claims were previously dismissed). Indeed, Plaintiffs initiated their transactions with Defendants by paying for fuel "although no obligation to make such payment existed." *Love v. Clark*, No. E2017-01138-COA-R3-CV, 2018 WL 2259081, at *1 (Tenn. Ct. App. May 17, 2018) (quoting *Still v. Equitable Life Assurance Soc'y of U.S.*, 54 S.W.2d 947,

---

Recovery Certification Procedure CP-201. Accordingly, not only was replacing single-nozzle fuel pumps commercially impracticable, but Tennessee law prohibited it prior to 2016.

948 (Tenn. 1932)). Plaintiffs cannot attempt to "recover back" such payments without facts alleging fraud, duress, or extortion. *See id.* Accordingly, these claims should be dismissed.

### C.  Count IV (Declaratory Relief).

Count Four is a claim for declaratory relief under the federal Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs seek a judgment that Defendants have "no lawful right to retain the difference between the price of the premium motor fuel charged and the concurrent price of the lower grade motor fuel for the residual amount of fuel left in the pump from a prior customer that pumped lower grade motor fuel." (Fudge Compl. ¶ 55; Watson Compl. ¶ 55; Baird Compl. ¶ 55.) This claim is both unnecessary and factually unsupported, and should be dismissed accordingly.

*First*, merely listing the elements of a cause of action without providing further factual allegations does not satisfy the pleading requirements under the Federal Rules of Civil Procedure. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (holding formulaic recitation of the elements and legal conclusions cannot satisfy the pleading standards). Yet this is exactly what Plaintiffs did by conclusorily pleading that "reasonable analysis of the facts will reveal that a declaratory judgment decision will be useful and fair," without providing any analysis, without pointing to any supporting facts, and without explaining why such a decision would be "useful" or "fair." *Id.* These bare assertions do not satisfy Plaintiffs' pleading obligations under the Federal Rules.

*Second*, the declaratory judgment claim is unfounded. As Judge Trauger has explained, "the law is clear that, in the context of a declaratory judgment action, 'allegations of past injury alone are not sufficient to confer standing. The plaintiff must allege and/or demonstrate actual present harm or a significant possibility of future harm.'" S*pencer v. City of Hendersonville*, 487 F. Supp. 3d 661, 676 (M.D. Tenn. 2020). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment." *Id.* Notably absent from the Complaints, however, are any allegations about immediate or future harm. To the contrary, Plaintiffs limited the time period of recovery from May/June 2017 through May/June 2023, and their damages are solely focused on "disgorg[ing] the difference between the price of the premium motor fuel charged and the concurrent price of the lower grade motor fuel delivered." (Fudge Compl. ¶¶ 28, 47; Watson Compl. ¶¶ 28, 47; Baird Compl. ¶¶ 28, 47.)

*Third*, Count IV should be dismissed as entirely duplicative of Plaintiffs' other claims. *Good L Corp. v. Fasteners for Retail, Inc.*, No. 3:18-cv-00489, 2020 WL 2572480, at *1 (M.D. Tenn. May 20, 2020) ("A court may dismiss a redundant or mirror image claim for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6)."); *see also Pineda Transp., LLC v. FleetOne Factoring, LLC*, No. 3:18-cv-0089, 2018 WL 2137760, at *7 (M.D. Tenn. May 9, 2018) ("A declaration of rights as requested could clarify the rights and relations of the parties, but so could a ruling on Plaintiffs' other claims. Under these circumstances, the court, in its discretion, finds that an alternative remedy—decisions on Plaintiffs' remaining breach of contract and fraud claims—is more effective than a declaratory judgment."). Accordingly, Plaintiffs' declaratory judgment claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiffs' complaints should be dismissed with prejudice because they are preempted under federal law, Defendants' conduct is protected by state law, and Plaintiffs' claims are insufficiently pled.

30

Dated: September 27, 2023

Respectfully submitted,

/s/ Peter Wahby_____
Robert A. Peal
SIMS FUNK, PLC
3322 West End Ave., #200
Nashville, TN 37203
rpeal@simsfunk.com

Peter Wahby
Allison Stewart
Hannah Putnam
Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, TX 75246
Peter.wahby@gtlaw.com
Stewarta@gtlaw.com
Hannah.putnam@gtlaw.com

*Attorneys for Love's Travel Stops
& Country Stores, Inc.*

/s/ Tristan L. Duncan_____
Tristan L. Duncan
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Phone: (816) 474-6550
Email:  tlduncan@shb.com

Daniel B. Rogers
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Phone: (305) 358-5171
Email: drogers@shb.com

Frederick S. Rudesheim (TN #035680)
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, D.C. 20006
Phone: (202) 783-8400
Email: frudesheim@shb.com

*Attorneys for Defendant, Murphy Oil USA, Inc.*

/s/ Michael T. Schmitt_____
Michael T. Schmitt
ORTALE KELLEY LAW FIRM
330 Commerce Street, Suite 110
Nashville, TN 37201
mschmitt@ortalekelley.com

ASHLEY T. KISNER
Texas State Bar No. 00791783
akisner@clarkhill.com
N. TOBIAS SMITH
Texas State Bar No. 24033230
tsmith@clarkhill.com
CLARK HILL PLC
901 Main Street, Suite 6000

31

Dallas, Texas 75202
Telephone: (214) 651-4300
Fax: (214) 651-4330

*Attorneys for Speedway LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 27, 2023, a true and exact copy of **Defendants'
Memorandum in Support of Motion to Dismiss Class Action Complaint** has been served
through the Court's CM/ECF system and will be sent electronically to the following registered
participants as identified on the NEF and paper copies will be sent to those indicated as non-
registered participants.

Robert A. Peal
SIMS FUNK, PLC
3322 West End Ave., #200
Nashville, TN 37203
rpeal@simsfunk.com

Peter Wahby
Allison Stewart
Hannah Putnam
Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200
Dallas, TX 75246
Peter.wahby@gtlaw.com
Stewarta@gtlaw.com
Hannah.putnam@gtlaw.com

*Attorneys for Love's Travel Stops
& Country Stores, Inc.*

Michael T. Schmitt
ORTALE KELLEY LAW FIRM
330 Commerce Street, Suite 110
Nashville, TN 37201
mschmitt@ortalekelley.com

ASHLEY T. KISNER
Texas State Bar No. 00791783
akisner@clarkhill.com
N. TOBIAS SMITH
Texas State Bar No. 24033230
tsmith@clarkhill.com
CLARK HILL PLC
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Fax: (214) 651-4330

*Attorneys for Speedway LLC*

Gordon Ball
Jonathan Tanner Ball
GORDON BALL, PLLC
3728 West End Avenue
Nashville, TN 37205
gball@gordonball.com
jtannerball@gmail.com

Thomas Bienert, Jr.
Daniel Goldman
BIENERT KATZMAN LITTRELL
WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
tbienert@bklwlaw.com
dgoldman@gklwlaw.com

Times Wang
NORTH RIVER LAW PLLC
1300 I Street NW, Suite 400E
Washington, DC 20005
twang@northriverlaw.com

Bryan E. Delius
DELIUS & MCKENZIE, PLLC
124 Court Avenue
Sevierville, TN 37862
bryan@deliusmckenzie.com

*Attorneys for Plaintiffs*

33

Tristan L. Duncan
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Phone: (816) 474-6550
Email:  tlduncan@shb.com

Daniel B. Rogers
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Phone: (305) 358-5171
Email: drogers@shb.com

Frederick S. Rudesheim (TN #035680)
SHOOK, HARDY & BACON L.L.P.
1800 K Street, N.W.
Suite 1000
Washington, D.C. 20006
Phone: (202) 783-8400
Email: frudesheim@shb.com

*Attorneys for Defendant, Murphy Oil USA, Inc.*


*/s/ Tristan L. Duncan*
Tristan L. Duncan

4859-4490-5602

34